

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AFM:NCG
F. # 2022R00514

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 5, 2024

By ECF

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Steven Molinaro
                Criminal Docket No. 22-382 (NGG)

Dear Judge Garaufis:

      The government respectfully submits this sentencing memorandum in advance of the defendant Steven Molinaro's sentencing, which is scheduled for April 17, 2024, at 2:30 p.m. For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the United States Sentencing Guidelines ("Guidelines") range of 110 to 137 months' imprisonment. This range balances the seriousness of the defendant's crime and the need for deterrence of like behavior.

I.    Background

    A.  Offense Conduct

      The defendant's conduct is set forth in the Probation Department's Presentence Investigation Report, dated February 9, 2024 ("PSR"). In short, the defendant—a convicted felon and recidivist—unlawfully possessed a firearm and ammunition and obstructed justice, in violation of Title 18, United States Code, Sections 922(g)(1) and 1512(c)(1), respectively. (PSR ¶¶ 1-2).

      On April 27, 2022, the New York City Police Department ("NYPD") responded to a 911 call the defendant made regarding a shooting at his residence located at Lyman Avenue in Staten Island, New York. (Id. ¶ 10). During the 911 call, the defendant reported that a woman accidentally shot herself. (Id.).

      When law enforcement arrived at the residence, the defendant and another individual ("Co-Conspirator") were present, along with the victim ("Jane Doe"), who was lying in the defendant's bedroom next to a pool of blood with a bullet wound in her chest. (See id. ¶

11). When asked about the incident, the defendant stated that Jane Doe's ex-boyfriend shot her and that the defendant called law enforcement approximately one hour later. (Id.).

Jane Doe was transported to a local hospital for surgery. (Id. ¶ 11). Jane Doe informed law enforcement that, in fact, the defendant shot Jane Doe in the chest. (Id. n.1). Specifically, Jane Doe—the defendant's ex-girlfriend—stated that prior to the shooting, the defendant began questioning her regarding her whereabouts and who she was spending time with while they were broken up in the months prior to that day. (See id.). When Jane Doe told the defendant that what she had been doing was not his business, he became upset. The defendant—who was sitting on top of Jane Doe at the time—then pulled out a firearm from the side of his bed and first pointed the firearm at Jane Doe's head and then at her chest. (Id.). Jane Doe told the defendant to put down the gun, but the defendant continued pointing the gun at Jane Doe's head and then back at her chest several times. Jane Doe again told the defendant to put down the gun, and he shot her in the chest while still on top of her. (Id.). Following Jane Doe's surgery, she identified the defendant as the shooter. (Id. ¶ 12). The bullet is still inside of Jane Doe's body ████████████████████████████████████████████████████ (Id. ¶ 11 n.2).

After law enforcement arrived on the scene, they observed video footage showing that after the defendant called 911, the defendant discarded a black trash bag into his neighbor's trash can. (See id. ¶ 10). Law enforcement subsequently recovered from the black trash bag a loaded Ruger 9mm semi-automatic pistol bearing serial number 459-81244, with one 9mm Luger cartridge in the chamber and another loose 9mm Luger cartridge. (Id. ¶ 10). The same trash bag contained envelopes bearing the defendant's name and address. DNA testing revealed that the defendant's DNA was present on the firearm. (Id. ¶ 12). The firearm also matched a shell casing found in the room where Jane Doe was shot. (Id.).

When law enforcement arrived at the residence, they also found approximately 43 kilograms of marijuana, much of it in vacuum-sealed bags; a vacuum sealer; clear bags; a money counter; and a scale with drug residue on it. In addition, there was approximately $161,029.00 in cash. Video surveillance revealed that the Co-Conspirator attempted to hide a portion of that cash in a dog house outside of the residence.

The defendant was originally arrested following the incident on April 27, 2022 by the NYPD on related state charges, at which time he stated, "this is what females do to you" and complained that he had lost his money and his marijuana. (Id. ¶ 11). On August 19, 2022, a grand jury sitting in the Eastern District of New York returned a three-count indictment charging the defendant with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), attempted obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1), and conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846 and 841(b)(1)(D). The defendant was arrested in connection with the federal charges on August 23, 2022. The defendant was in federal custody from the date of his arrest until December 20, 2022, when he was released on a $5 million secured bond with pretrial release conditions.

### B. Defendant's Guilty Plea

On July 7, 2023, the defendant pled guilty pursuant to a plea agreement to Counts One and Two of the indictment, specifically, being a felon in possession of a firearm and ammunition and obstruction of justice in violation of 18 U.S.C. § 922(g)(1) and 1512(c)(1), respectively. (Id. ¶ 1).

### C. Defendant's Criminal History

The defendant's extensive criminal history exhibits a pattern of violence and disregard for the law. Notably, the defendant has multiple prior convictions and a history of disregarding court orders.

On or about February 6, 2006, the defendant was arrested and later convicted of riot in the first degree and assault in the first degree, and he was sentenced to five years' incarceration. (Id. ¶ 42). On or about July 18, 2006, prior to his sentencing for riot in the first degree and assault in the first degree, the defendant was arrested for assault in the second degree, for which he was convicted and sentenced to five years' incarceration, to run concurrently with his sentence for his convictions for riot in the first degree and assault in the first degree. (Id. ¶ 43).

On or about May 25, 2007, the defendant was arrested for criminal contempt in the second degree for disobeying the Court by violating an order of protection. (Id. ¶ 44). He was sentenced to one year of imprisonment. (Id.).

The defendant has also engaged in repeated criminal conduct related to controlled substances. On or about February 6, 2017, the defendant was convicted of possessing marijuana in New Jersey, (id. ¶ 45), and on or about January 30, 2017, the defendant was convicted of possessing marijuana in California. (Id. ¶ 46). On or about March 7, 2017, the defendant was convicted of operating a motor vehicle while impaired by drugs. (Id. ¶ 47).

### D. Defendant's Post-Release Violations

On December 29, 2022, Pretrial Services issued a memorandum informing the Court that the defendant  to his Pretrial Services Officer and had a positive test for fentanyl, benzodiazepines, methadone, and marijuana. (Id. ¶ 5). The defendant admitted to using marijuana, heroin, suboxone, and methadone while he was incarcerated at the Metropolitan Detention Center ("MDC"). (Id.).

On February 2, 2023, Pretrial Services issued a memorandum informing the Court that the defendant tested positive for marijuana on January 6, 2023. (Id. ¶ 6). The defendant denied using marijuana and stated that he had last used it while incarcerated at MDC. (Id.).

On June 16, 2023, Pretrial Services issued a memorandum informing the Court that the defendant violated his pretrial release conditions. (Id. ¶ 7). Specifically, Pretrial Services observed a prosthetic device at the defendant's residence, which is commonly used to tamper with urinalysis drug testing. (Id.). When the Pretrial Services Officer asked the defendant about the device, he initially lied about the device but then admitted that his friend gave it to him because he was struggling to remain sober. (Id.). The defendant then admitted to eating a product containing psilocybin and marijuana. (Id.).

II. Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable [U.S. Sentencing Guidelines ("Guidelines" or "USSG")] range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

III. Guidelines Calculation

The government agrees with Probation's estimate of the Guidelines' range set forth in the PSR:

4

Count One (Felon in Possession of a Firearm and Ammunition)

  Base Offense Level (U.S.S.G. §§ 2A2.1(a)(2), 2K2.1(c)(1)(A), 2X1.1(c))  27

  Plus: Victim sustained life threatening bodily injury
   (U.S.S.G. §2A2.1(b)(1)(A))  +4

  Total:  31

Count Two (Attempted Obstruction of Justice)

  Base Offense Level (U.S.S.G. § 2J1.2)  14

  Plus: Offense involved selection of probative tangible object to
  alter or destroy (U.S.S.G. §2J1.1(b)(3))  +2

  Total:  16

Grouping Analysis

  Counts grouped together (U.S.S.G. § 3D1.2(c))

  Applicable offense level is highest level (U.S.S.G. §3D1.3(a))  31

  Less: Acceptance of Responsibility (§ 3E1.1(a))  -2

  Less: Acceptance of Responsibility (§ 3E1.1(b))  -1

  Total:  28

The adjusted total offense level is 28, which, based on a Criminal History Category of IV, results in a range of imprisonment of 110-137 months imprisonment.[1]

IV.  The Defendant's Criminal History Category Does Not Warrant a Downward Departure

  While the defendant takes issue with the circumstances surrounding the above-referenced convictions, see ECF No. 52, Defendant's Sentencing Memorandum (hereinafter "Def. Mem.") at 7-8, the fact remains that the defendant's convictions and corresponding criminal history points result in a criminal history category of IV, which the defendant does not dispute. (See Def. Mem. at 1).

---

[1]  The government, in its plea agreement with the defendant, included a two-point enhancement for obstruction of justice in Count One, resulting in a total offense level of 30. The government, however, agrees with Probation's calculation set forth in the PSR.

The defendant argues that his criminal history category substantially overstates his criminal history, such that a downward departure is appropriate, pursuant to U.S.S.G. § 4A1.3(b)(1). (Def. Mem. at 19).

Section 4A1.3(b)(1) provides that: "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." Such a departure would be warranted, for example, if the defendant "had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. § 4A1.3(b)(1) Application Note 3; see also United States v. Carrasco, 313 F.3d 750, 757 (2d Cir. 2002) ("This type of departure is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a [Criminal History Category] that overstates the seriousness of the defendant's prior record.").

Here, the defendant argues that his criminal history is over-represented because (1) the defendant's felony convictions occurred when he was 16 years old; and (2) the defendant's misdemeanor marijuana offenses were committed several years ago while he was suffering from an addiction for which he has since received treatment. (Def. Mem. at 19-22).

First, the defendant's felony offenses were well within the qualifying time period. U.S.S.G. § 4A1.1(a) assigns three criminal history points for any sentence exceeding one year and one month for which the defendant's incarceration extended into the fifteen-year period preceding the "commencement of the instant offense." U.S.S.G. § 4A1.1(a) Application Note 1; U.S.S.G. § 4A1.2(e). The defendant's conduct in this case commenced on April 27, 2022. (PSR ¶ 10). The defendant's incarceration for his felony convictions lasted until June 26, 2011, when he was released on parole. (Id. ¶¶ 42, 43.). Thus, the defendant's incarceration lasted well into the 15-year period prior to his instant offense conduct. See U.S.S.G. § 4A1.2(e)(1) ("Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period."). While the government acknowledges that the defendant's prior felony convictions were for offenses that occurred in 2006, when the defendant was a minor, the fact that the defendant went on to commit yet another violent offense as an adult undermines the argument that the defendant's criminal history score "over-represents . . . the likelihood that the defendant will commit other crimes." See U.S.S.G. § 4A1.3(b)(1).

Second, the defendant's three drug-related offenses are similarly well within the qualifying time period and occurred only approximately five years before the instant offense. Indeed, the instant offense also involved marijuana. ███████████████ no downward departure is warranted given the defendant's ongoing criminal conduct related to controlled substances.

The defendant also argues that his prior assault in the second-degree charge is being "double-counted" due to its inclusion both in the defendant's criminal history and under U.S.S.G. § 2K2.1(a)(1). However, as noted above, the government disagrees that U.S.S.G. §

2K2.1(a)(1) applies, and therefore, the defendant's prior assault conviction is not in fact "double-counted."

The defendant's prior offenses demonstrate a repeated and intentional defiance of the law. His criminal history category appropriately reflects this record and is consistent both with the letter and the spirit of the Guidelines. See, e.g., United States v. Knowles, No. 17-CR-672 (WFK), 2019 WL 1306109, at *8 (E.D.N.Y. Mar. 20, 2019), aff'd, 794 F. App'x 134 (2d Cir. 2020) (rejecting request for downward departure based on argument that, among other things, the defendant's prior sentence was "less than six months from the 15 year exclusion"). Indeed, consideration of the defendant's age and seriousness of prior offenses is already built into Section 4A1.1; the defendant's proposals would render the contours of that section meaningless. Because the defendant's criminal history category of IV does not over-represent the seriousness of his criminal history, much less "substantially" so, the Court should not apply the proposed departure.

V.     The Attempted Murder Cross-Reference Applies

The applicable Guidelines for the defendant's conviction under 18 U.S.C. § 922(g)(1) is Section 2K2.1 of the Guidelines. Pursuant to U.S.S.G. § 2K2.1(c)(1)(A), if a defendant uses a firearm in connection with the commission of another offense, U.S.S.G. § 2X1.1 applies. Section 2X1.1(c) provides that "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." Accordingly, U.S.S.G. § 2A2.1 applies to "Attempted Murder and Assault with Intent to Commit Murder" and provides for a base offense level of 27 if the crime does not constitute first-degree murder.

The defendant challenges both the government and the Probation Department's calculation of his base offense level based on the application of the attempted murder cross-reference. Instead, the defendant argues that the defendant possessed a firearm in connection with assault in the second degree, in violation of New York Penal Law § 120.05. (Def. Mem. at 2).

The defendant's assertions are belied by the events on April 27, 2022—which are undisputed—and they should be rejected in their entirety. As shown below, the defendant "actually attempted or intended to kill his victim[]" when he shot Jane Doe in the chest. See United States v. Stroman, 498 Fed. Appx 67, 69 (2d Cir. 2012) (citation omitted).

To prove attempted murder in the second degree under Section 2A2.1(a) of the Guidelines, the government must prove by a preponderance of the evidence that the defendant intended to kill. Id. (citing Braxton v. United States, 500 U.S. 344, 351 n* (1991)). "Although the mere fact that a deadly weapon was used does not ipso facto prove the specific intent, only a minimal additional showing of intent is necessary, and intent to kill can be inferred where the defendant shoots multiple times and/or at close range." McCallum v. United States, No. 14-CR-476-12 (CS), 2019 WL 5088587, at *7 (S.D.N.Y. Mar. 1, 2019) (internal citations and quotation marks omitted).

Courts have repeatedly held that an intent to kill can be inferred from the circumstances, including shooting at an individual at close range. See United States v. Atehortva, 69 F.3d 679, 687 (2d Cir. 1995) (undisputed evidence that the defendant repeatedly fired a gun at federal agents at close range, without striking the agents, was sufficient for the district court to find by a preponderance of the evidence that the defendant intended to kill the agents); United States v. Caston, 851 Fed. App'x 557, 565 (6th Cir. 2021) (stating that specific intent to kill could be inferred from a defendant firing a gun aimed at an individual or based solely on a defendant shooting in a victim's direction such that the bullet could have struck the victim); United States v. McMorris, 224 Fed. App'x 549 (8th Cir. 2007) (finding intent supporting a § 2A2.1(a)(2) enhancement where defendant grabbed a gun and shot at officers pursuing him from a distance of fifty or sixty feet); Roberts v. Superintendent of the Attica Corr. Facility, No. 07-CV-285S, 2008 WL 3833554, at *6 (W.D.N.Y. Aug. 15, 2008) ("The evidence that petitioner shot Spencer from a distance of 15 feet made it reasonable for a juror to conclude that he intended to kill Spencer.").

Here, it is undisputed that the defendant shot Jane Doe in the chest at extremely close range. Additionally, the defendant's actions prior to the shooting show that he acted with the specific intent to kill. As set forth in the PSR ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓,[2] prior to the shooting, the defendant began questioning her regarding her whereabouts and who she was spending time with while they were broken up in the months prior to that day. (PSR ¶ 11). When Jane Doe told the defendant that what she had been doing was not his business, he became upset. The defendant—who was sitting on top of Jane Doe at the time—then pulled out a firearm from the side of his bed, "cocked it back," and first pointed the firearm at Jane Doe's head and then at her chest. (Ex. A at VH00012). Jane Doe told the defendant to put down the gun, but the defendant continued pointing the gun at Jane Doe's head, specifically to the top middle portion of her head and to the side at her temples, and then back at her chest several times. (Ex. A. at VH00012-13). Jane Doe again told the defendant to put down the gun, he put the gun down briefly, and then he picked it back up and shot her in the chest while still on top of her. (Ex. A. at VH00014; PSR ¶ 11).

The defendant's actions—shooting Jane Doe in the chest from mere inches away while he was physically on top of her—alone support that he acted with intent to kill. See Roberts, 2008 WL 3833554, at *6 ("The evidence that the victim was shot at close range is sufficient to support the determination that the shooter intended to kill the victim.") (citation omitted)). But in addition to shooting Jane Doe in the chest at close range, the defendant pointed the firearm at Jane Doe's head several times before ultimately shooting her in the chest. The defendant's actions do not evince an accident as he claims; rather, the defendant repeatedly pointing the firearm at Jane Doe's head prior to shooting her in the chest show a deliberate decision to shoot her. The defendant also argued with Jane Doe regarding her whereabouts and an individual she had dated prior to shooting her, and she refused to engage with him. Although the government is not required to prove the defendant's motive, a motive is established by the fact that the defendant argued with Jane Doe, his ex-girlfriend, regarding an individual she had

---

[2] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8

dated. These facts—coupled with a shot at close range that very well could have been lethal—show that the defendant acted intentionally.

The defendant cites Jane Doe's statements to the defense's investigator as evidence that the defendant did not act with the intent to kill. But Jane Doe—the victim of the defendant's crime—cannot know the defendant's true intent. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The defense also makes much of the defendant's decision to call 911 after he shot Jane Doe, arguing that he called 911 immediately after Jane Doe was shot, which shows that he did not act with the specific intent to kill. But intent can be formed and need only exist at the moment the defendant engaged in the act. See Diggs v. Artus, No. 10-CV-1233 (CBA), 2013 U.S. Dist. LEXIS 31054, at *33 (E.D.N.Y. Mar. 5, 2013) (noting New York state jury instruction for attempted murder that stated, "The intent can be formed and need only exist at the very moment the person engaged in the prohibited conduct or acts to cause the prohibited result and not at any earlier time."). That the defendant may have later regretted shooting Jane Doe, resulting in his calling 911, does not negate his intent to kill in the moment that he shot Jane Doe.

Finally, the defense also speculates that the defendant was high at the time he shot Jane Doe. While drugs or intoxication "may sometimes defeat mens rea," it does not where the defendant "was capable of rational thought and intentional behavior." United States v. Vaught, 133 Fed. App'x 229, 233 (6th Cir. 2005) (citing United States v. Newman, 889 F.2d 88, 92–93 (6th Cir. 1989)); see also United States v. Sewell, 252 F.3d 647, 650 (2d Cir. 2001) (holding that voluntary intoxication does not negate the intent element of a crime of general intent such as robbery but may be a defense to a specific intent crime). Here, the defendant was able to call 911 and lie that Jane Doe shot herself; he discarded the firearm in his neighbor's trash can; he called 911 a second time; and he spoke to law enforcement when they arrived on the scene and fabricated a story about Jane Doe's ex-boyfriend shooting her. All of these actions show that the defendant was capable of rational thought and intentional behavior. See, e.g., Carter v. Artuz, 150 F. Supp. 2d 440 (E.D.N.Y. 2001) (finding that even if petitioner was intoxicated at the time he shot law enforcement, a rational jury could have concluded he was lucid enough to form the requisite intent where he provided a detailed statement to law enforcement and followed law enforcement instructions on disassembling his gun); United States v. Ward, 2019 WL 6255198, at *7 (D. Conn. Nov. 22, 2019) (defendant's statement that he was "rolling on a zan" did not negate specific intent for attempted murder). Thus, the Guidelines calculation in the PSR is correct.

---

3   This document has been provided to defense counsel and Probation and can be made available to the Court.

## VI. A Sentence Between 110 to 137 Months' Incarceration is Appropriate

The government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. In determining a sentence, the court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a). As relevant here, those factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; deterrence; and protection of the public from further crimes of the defendant. Id. §§ 3553(a). Each of these factors weighs in favor of a sentence between 110 to 137 months' incarceration.

Here, the Guidelines range of 110 to 137 months' incarceration appropriately reflects the nature of the offense and the history and characteristics of the defendant. At the outset, a significant term of incarceration is necessary to reflect the seriousness of the offense. The defendant unlawfully possessed a firearm and ammunition and used it to shoot his ex-girlfriend in the chest at close range, nearly killing her. There is no doubt that the presence of illegal firearms in this District is dangerous to the community, even more so when the firearm is intentionally fired at another. The defendant's attempts to downplay his crime as a tragic accident are inconsistent with his actions prior to the shooting, when he argued with Jane Doe and repeatedly pointed the firearm at her head before ultimately shooting her in the chest. The defendant then attempted to obstruct the government's investigation by discarding the firearm, lying to law enforcement and reporting to law enforcement that the firearm was "gone."

Additionally, the defendant is a recidivist who has been arrested and convicted of multiple crimes. His criminal history includes violent offenses, such as his convictions for riot in the first degree and assault in the second degree. Shorter sentences imposed in past cases have clearly failed to deter the defendant from continuing to violate the law.

The government acknowledges the arguments set forth by the defendant regarding ████████████████████████████████████████████████████████. On balance, however, a Guidelines sentence is appropriate to account for the seriousness of this crime and specific and general deterrence. A Guidelines sentence will make clear to those who illegally obtain and use firearms against others that such crimes will be seriously punished in this District.

A Guidelines sentence of 110 to 137 months' would adequately address the seriousness of the defendant's crime, deter others and account for the defendant's history of criminality and failure to adhere to the law. Additionally, the term of incarceration will protect the public from further crimes of the defendant.

## VII. Restitution

As noted in the PSR, the defendant stipulated to restitution in the full amount of Jane Doe's losses. (PSR ¶ 16). The government understands that Jane Doe has losses to report ███████████████████████ and respectfully requests that the Court postpone its final determination of the victim's losses in accordance with Title 18, United States Code, Section 3664(d)(5).

VIII.   Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range, that is, between 110 to 137 months' imprisonment.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:   /s/ Nina C. Gupta
      Nina C. Gupta
      Assistant U.S. Attorney
      (718) 254-6257

cc:   Clerk of Court (NGG) (By ECF)
      Defense Counsel of Record (By ECF and Email)
      United State Probation Officer (By Email)